**[NOT YET SCHEDULED FOR ORAL ARGUMENT]**

Nos. 14-5210 & 14-5218

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

UNITED STATES OF AMERICA, ex rel. Robert R. Purcell,

Plaintiff-Appellant,

v.

MWI CORPORATION,

Defendant-Appellee.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————

**INITIAL BRIEF FOR THE UNITED STATES**

———————————

JOYCE R. BRANDA
  *Acting Assistant Attorney General*

RONALD C. MACHEN JR.
  *United States Attorney*

MICHAEL S. RAAB
MELISSA N. PATTERSON
  *(202) 514-1201*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.  Parties and Amici.

Plaintiff in the district court, and appellant in this appeal, is the United States of America.  Although this Court's docket lists relator Robert R. Purcell as an appellee, he was a relator-plaintiff below and did not file a notice of appeal.

In the district court, MWI Corporation and J. David Eller were defendants.  MWI Corporation is an appellee in this case, but Mr. Eller was dismissed from the case, *see* Docket No. 233, Case No. 1:98-cv-2088 (D.D.C. March 20, 2008), and the government therefore does not understand him to be a party to this litigation any longer.

There were no amici in district court.

### B.  Rulings Under Review.

The rulings under review are the district court's memorandum opinion of February 10, 2014, Docket No. 472, Case No. 1:98-cv-2088

(D.D.C.) (Judge Kessler), and judgment of February 12, 2014, Docket No.

473, Case No. 1:98-cv-2088 (D.D.C.), ordering defendant to pay the United

States only $580,000.  The memorandum opinion is available at *United*

*States ex rel. Purcell v. MWI Corporation*, 15 F. Supp. 3d 18 (D.D.C. 2014).

### C.    Related Cases.

The case on review has not previously been before this Court or any

other court.  MWI Corporation has filed a notice of cross-appeal, and this

Court has consolidated that appeal, Case No. 14-5218, with this case.

 /s/ **Melissa N. Patterson**
MELISSA N. PATTERSON

# TABLE OF CONTENTS

**Page**

GLOSSARY

STATEMENT OF JURISDICTION ........................................................1

STATEMENT OF THE ISSUE ............................................................1

PERTINENT STATUTES AND REGULATIONS.............................................2

STATEMENT OF THE CASE ............................................................2

    A.   STATUTORY BACKGROUND .......................................................2

    B.   FACTUAL BACKGROUND ............................................................3

SUMMARY OF ARGUMENT ..............................................................8

STANDARD OF REVIEW .................................................................10

ARGUMENT.....................................................................................10

    I.   THE FALSE CLAIMS ACT DOES NOT PERMIT
        EVASION OF DAMAGES LIABILITY BECAUSE
        A THIRD PARTY FULFILLED AN INDEPENDENT
        OBLIGATION TO REPAY GOVERNMENT FUNDS.................10

        A.   The Supreme Court Has Calculated Offsets
           To Multiplied FCA Damages Awards To Best
           Effectuate The Act's Purposes.............................................11

B.    The District Court Misapplied *Bornstein* And Contravened The FCA's Purposes ............................16

C.    Precedent Does Not Support The District Court's Offset Calculation ...................................................26

CONCLUSION ......................................................................................30

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** <span>**Page**</span>

*Allison Engine Co. v. United States ex rel. Sanders,*
    553 U.S. 662 (2008) ..................................................................................2

*Burlington Indus., Inc. v. Milliken & Co.,*
    690 F.2d 380 (4th Cir. 1982)..................................................................24

*Cook County v. United States ex rel. Chandler,*
    538 U.S. 119 (2003) ................................................................... 12, 13, 14

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.,*
    995 F.2d 425 (3d Cir. 1993)....................................................................28

*Hudson v. United States,*
    522 U.S. 93 (1997) .................................................................................13

*Texas Industries, Inc. v. Radcliff Materials, Inc.,*
    451 U.S. 630 (1981) ................................................................................12

*\*United States v. Bornstein,*
    423 U.S. 303 (1976) .................7, 9, 10, 12, 13, 14, 15, 16, 17, 20, 21, 23, 24, 25

*United States v. Eghbal,*
    475 F. Supp. 2d 1008 (C.D. Cal. 2007), *aff'd,*
    548 F.3d 1281 (9th Cir. 2008)................................................... 22, 28

*United States v. Halper,*
    490 U.S. 435 (1989) ................................................................... 13, 21

* Authorities upon which we chiefly rely are marked with an asterisk.

*United States v. Mackby,*
   339 F.3d 1013 (9th Cir. 2003)...................................................................22

*United States v. Sci. Applications Int'l Corp.,*
   626 F.3d 1257 (D.C. Cir. 2010) ...................................................... 10, 26

*United States ex rel. Davis v. District of Columbia,*
   679 F.3d 832 (D.C. Cir. 2012) .................................................................26

*United States ex rel. Marcus v. Hess,*
   317 U.S. 537 (1943) .................................................................................12

*United States ex rel. Schaefer v. Conti Medical Concepts, Inc.:*
   No. 3:04-cv-400, 2009 WL 5104149 (W.D. Ky. Dec. 17, 2009) .............. 28, 29
   No. 3:04-cv-400, 2010 WL 1485660 (W.D. Ky. Apr. 12, 2010) .....................28

*Vermont Agency of Natural Resources v. United States ex rel. Stevens,*
   29 U.S. 765 (2000) ...................................................................................12

**Statutes:**

12 U.S.C. § 635(a)(1) ....................................................................................... 4

28 U.S.C. § 1291............................................................................................... 1

28 U.S.C. § 1331............................................................................................... 1

28 U.S.C. § 1345............................................................................................... 1

31 U.S.C. § 3729(a) ............................................................................... 2, 3, 7, 11

31 U.S.C. § 3729(a)(1) ................................................................................... 2, 3

iv

31 U.S.C. § 3729(a)(1)(A) (2009) ................................................................ 2

31 U.S.C. § 3729(a)(1)(B) (2009) ............................................................... 2

31 U.S.C. § 3729(a)(2) ........................................................................... 2, 3

31 U.S.C. § 3730 ..................................................................................... 1

31 U.S.C. § 3730(a) ................................................................................ 3

31 U.S.C. § 3730(b)(1) ........................................................................... 3

31 U.S.C. § 3730(b)(2) ........................................................................... 3

Act of Mar. 2, 1863, Ch. 67, 12 Stat. 696 ............................................. 11

Fraud Enforcement and Recovery Act of 2009,
    Pub. L. No. 111-21, 123 Stat. 1617 ................................................. 2

**Rules:**

Federal Rule of Civil Procedure 50(b) ................................................. 1, 8

**Other Authorities:**

S. Rep. No. 345, 99th Cong., 2d Sess. (1986) .................................. 11, 24

S. Rep. No. 10, 111th Cong., 1st Sess. (2009) ...................................... 2

# GLOSSARY

Exim          Export-Import Bank

FCA           False Claims Act

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1345 over this action brought in accordance with 31 U.S.C. § 3730. The district court's judgment became final on June 25, 2014, when that court denied defendant's motion under Federal Rule of Civil Procedure 50(b). *See* Docket No. 486. The United States filed a timely notice of appeal on August 22, 2014. *See* Docket No. 493. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Defendant MWI Corporation was held liable under the False Claims Act for fraudulently securing government loans for a third party; a jury calculated that the government sustained $7.5 million in damages due to MWI's fraud. The district court concluded that trebling this figure in accordance with the statute would render MWI liable for $22.5 million. The issue in this appeal is whether the district court erred in concluding that the third party's repayment of the loans in an amount exceeding $22.5 million entirely discharged MWI's liability for any damages.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    STATUTORY BACKGROUND

The False Claims Act ("FCA" or "Act") attaches liability to a wide

variety of fraud perpetrated against the government.  *See* 31 U.S.C.

§ 3729(a)(1), (2) (1986).[1]  Relevant here, the Act imposes liability on "[a]ny

person who . . . knowingly presents, or causes to be presented, to an officer

or employee of the United States Government or a member of the Armed

Forces of the United States a false or fraudulent claim for payment or

approval" or "knowingly makes, uses, or causes to be made or used, a false

---

[1] The Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617, modified and renumbered the subsections of 31 U.S.C. § 3729(a) such that the former § 3729(a)(1) and (2) are now found as amended at 31 U.S.C. § 3729(a)(1)(A) and (B) (2009).  Only the amendment to former § 3729(a)(2) was made retroactive.  *See* Pub. L. No. 111-21, § 4, 123 Stat. 1625.   That provision was designed "to clarify and correct erroneous interpretations of the law" in decisions such as *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008).  S. Rep. No. 10, 111th Cong., 1st Sess. 10 (2009).  Because the amendments are not relevant to this appeal, citations throughout this brief are to the pre-2009 version of the statute, as utilized by the district court.  *See, e.g.*, Op. 1 [JA__].

2

record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(1), (2). The Act specifies that such persons are "liable to the United States Government for a civil penalty" between $5,000 and $10,000 "plus 3 times the amount of damages which the Government sustains because of the act of that person." *Id.* § 3729(a).

The Attorney General may bring a civil action to recover treble damages and civil penalties for violations of the FCA. 31 U.S.C. § 3730(a). Alternatively, a private person (commonly known as a "*qui tam* relator") may bring a civil suit "for the person and for the United States Government." *Id.* § 3730(b)(1). The government has the option to intervene in the *qui tam* suit and proceed with the action itself. *Id.* § 3730(b)(2).

### B.    FACTUAL BACKGROUND

1. MWI Corporation manufactures and sells pumping equipment for irrigation and drainage. United States' Complaint, Docket No. 18, at 2 ¶ 6 [JA__]. In 1992, MWI arranged to sell irrigation pumps and other equipment to seven Nigerian states for $82.2 million. District Court

3

Opinion ("Op."), Docket No. 472, at 2 [JA__].  To finance this sale, MWI

and Nigeria applied to the Export-Import Bank ("Exim"), a federal entity

whose mission includes facilitating the export of U.S. goods and services

by providing loans and other types of financing to foreign purchasers of

such goods and services.  *Id.*; 12 U.S.C. § 635(a)(1).  Exim provided eight

loans totaling $74.3 million.  Op. 2 [JA__].

    In order to approve these loans, Exim required MWI to submit a

"Letter of Credit Supplier's Certificate" attesting that MWI had paid only

"regular commissions" in connection with the financed sales.  Op. 2-3

[JA__-__].  MWI submitted eight such letters.  *Id.* at 3 [JA__]; *see also*

Plaintiff's Trial Exhibit 283 [JA__] (eight certificates that MWI paid only

"[r]egular commissions . . . in the ordinary course of business" and stating

"[n]one" in the space provided to disclose "[o]ther payments").  After

approving the loan but before each disbursement of funds, Exim also

required MWI to submit a "Disbursement Supplier's Certificate" with the

same attestation.  Op. 3 [JA__].  MWI submitted fifty certificates as it drew

down funds on the Exim loans, each certifying that MWI was paying only

"regular" commissions to its sales agents in Nigeria.  *Id.*; *see also* Plaintiff's

Trial Exhibit 284 [JA__] (fifty certificates that MWI paid only "[r]egular

commissions . . . in the ordinary course of business" and stating "[n]one" in

the space provided to disclose "[o]ther payments").

Relator Robert Purcell, a former MWI employee, filed an FCA suit

against MWI in 1998.  Docket No. 1 [JA__].  Purcell alleged that despite its

numerous certifications, MWI had paid "irregular" commissions to its

long-time Nigerian sales agent, Alhaji Mohammed Indimi, totaling 30

percent of the contract prices.  Op. 3 [JA__].  The government elected to

intervene and filed its complaint in intervention in 2002, alleging that MWI

paid Indimi "excessive" commissions exceeding $25 million, which were

"highly irregular to MWI's own commission practices, as well as to normal

and customary commissions."  *Id.* at 4 [JA__]; United States' Complaint,

Docket No. 18, at 5 ¶ 23 [JA__].

The case went to trial in 2013, with the two counts under the FCA

going to a jury.  Op. 4 [JA__].  The district court instructed the jury that if it

found that MWI had violated the FCA, the jury should also specify the

number of false claims made and "'assess the amount of damages, if any, that the [G]overnment sustained because of MWI's acts.'"  *Id.* at 4-5 [JA__-__] (alteration in original) (quoting Closing Instructions ("Jury Instructions"), Trial Tr. Nov. 21, 2013 A.M. Session at 41:13-18 [JA__]).  The court further instructed the jury "that damages were 'the amount of money the government paid because of the false claims over and above what it would have paid had MWI not made the false claims,' and that it would need to 'set an award that puts the [G]overnment in the same position as it would have been if the defendant's claims had not been false.'"  *Id.* at 5 [JA__] (quoting Jury Instructions 41:19-24 [JA__]).

The jury returned a verdict for the United States on both counts under the False Claims Act.  Op. 5 [JA__]; Docket No. 453, at 1-2 [JA__-__]. On its verdict form, the jury specified that MWI had made 58 false claims material to the government's decision to pay, and that the government sustained $7.5 million in damages "because of those false or fraudulent claims."  Docket No. 453, at 1-2 [JA__-__].

In determining damages, the district court acknowledged that the jury had found that the government suffered $7.5 million in "actual damages," and that trebling this amount, as required by 31 U.S.C. § 3729(a), would yield a damages award of $22.5 million.  Op. 8 [JA__].  However, the district court concluded that all of Nigeria's eventual repayment—totaling $108 million, including interest and fees—of the loans that MWI had fraudulently secured constituted a compensatory payment under the Supreme Court's decision in *United States v. Bornstein*, 423 U.S. 303 (1976), thus offsetting entirely the $22.5 million in damages MWI otherwise would have owed.  Op. 9-21 [JA__-__].  The district court rejected the United States' argument that any offset granted MWI should be confined to the $7.5 million original loss to the government.  *Id.* at 21-25 [JA__-__].  The court reasoned that "[d]espite the fraudulent actions taken by MWI to persuade the Government to make these loans, . . . the Government has been 'made completely whole' because of Nigeria's repayments" and that entirely offsetting MWI's liability for damages was consistent with *Bornstein*.  *Id.* at 25-26 [JA__-__].

7

The court then turned to MWI's liability for civil penalties, imposing a $10,000 penalty for each of the 58 false claims identified by the jury. Op. 27-31 [JA__-__]. Thus, the district court concluded that MWI was liable to the government for $580,000 and judgment was entered accordingly. *Id.* at 32-33 [JA__-__]; Docket No. 473 [JA__]. This appeal followed.[2]

## SUMMARY OF ARGUMENT

The district court erred in deeming the entirety of Nigeria's repayment of its freestanding loan obligations to the United States "compensatory" for MWI's fraud in securing those loans. Nigeria repaid the government only what it promised, and only what would have been due to the government even if MWI had not committed fraud or the fraud had never been discovered. At most, Nigeria's repayment of its obligations compensated the government for the amount by which the United States' loan payout was inflated by fraud. The jury found that the United States suffered $7.5 million in damages due to MWI's fraud. If the jury viewed

---

[2] MWI filed a timely motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), *see* Docket No. 478, which the district court denied on June 25, 2014, *see* Docket No. 486.

8

that award as the portion of the loan that the government paid due to fraud, Nigeria's repayment can be viewed as compensating the United States for that original loss, and MWI is entitled to an offset in that amount.

Under no view of the jury verdict, however, can MWI's liability for treble damages be eliminated by the United States' receipt of what it was due from Nigeria under the loan contract. To conclude otherwise conflicts with the compensatory and deterrent purposes of the FCA's treble damages provisions. Moreover, in contravention of the Supreme Court's decision in *United States v. Bornstein*, 423 U.S. 303 (1976), the district court's approach to compensatory offsets would make defendants' liability vary widely based on third party actions and leave the Act's damages provisions open to subversion by defendants' strategic behavior. This Court should reverse the district court's judgment insofar as it concluded that MWI was not liable for any damages under the FCA, and direct the district court to enter a damages award of $15 million.

## STANDARD OF REVIEW

The interpretation of the False Claims Act's damages provision is a question of law reviewed *de novo*. *See United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010).

## ARGUMENT

**I.  THE FALSE CLAIMS ACT DOES NOT PERMIT EVASION OF DAMAGES LIABILITY BECAUSE A THIRD PARTY FULFILLED AN INDEPENDENT OBLIGATION TO REPAY GOVERNMENT FUNDS.**

The jury concluded that the government suffered $7.5 million in damages due to MWI's fraud in securing Nigeria a $74 million government loan to purchase MWI's products. The district court concluded that Nigeria's ultimate repayment of that loan entirely eliminated MWI's treble damages liability of $22.5 million. This decision runs contrary to the Supreme Court's reasoning in *United States v. Bornstein*, 423 U.S. 303 (1976), and the purposes of the Act's damages provision. At most, Nigeria's repayment of the loan compensated the government only for its original loss of $7.5 million due to MWI's fraud. This Court should reverse with instructions to enter a revised damages award of $15 million.

10

**A.      The Supreme Court Has Calculated Offsets To Multiplied FCA Damages Awards To Best Effectuate The Act's Purposes.**

1.  The False Claims Act bars a variety of activities defrauding the government, including fraudulently inducing the government to lend inflated amounts.  *See* 31 U.S.C. § 3729(a); S. Rep. No. 345, 99th Cong., 2d Sess. 9 (1986) ("Senate Report") (noting in connection with 1986 amendments to the Act that "a false claim in connection with a sale financed by the Agency for International Development or Export-Import Bank" is "actionable").[3]  Since the Act's inception in 1863, the Act has provided that those who violate these prohibitions are liable for a multiple of the damages suffered by the United States as a result of the fraud.  *See* Act of Mar. 2, 1863, Ch. 67, § 3, 12 Stat. 696, 698 (providing for "double the amount of damages which the United States may have sustained by reason of the doing or committing" specified fraudulent acts).  As the Supreme

---

[3] The Senate Report notes that "such claims" in connection with government financing "may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program, or though payments on the Government loan are current, if by means of false statements the Government was induced to lend an inflated amount."  Senate Report 9.

Court has explained, the Act's original double damages provision "play[s] an important role in compensating the United States in cases where it has been defrauded," since "'the chief purpose of the (Act's civil penalties) was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole.'" *Bornstein*, 423 U.S. at 314 (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551-52 (1943)).

Congress subsequently increased the Act's damages multiplier from double to treble, and the Supreme Court has explained that the Act as revised still has "a compensatory side, serving remedial purposes," but now also serves "punitive objectives." *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003); *see also Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 786 (2000) ("'The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers.'") (quoting *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981)).  The

Court emphasized the continuing compensatory purpose of the Act's

increased damages multiplier: "[t]here is no question that some liability

beyond the amount of the fraud is usually 'necessary to compensate the

Government completely for the costs, delays, and inconveniences

occasioned by fraudulent claims.'" *Cook County*, 538 U.S. at 130 (quoting

*Bornstein*, 423 U.S. at 315) (noting that "as much as 30 percent of the

Government's recovery" in a False Claims Act suit may be diverted to a

private relator, *id.* at 131); *see also United States v. Halper*, 490 U.S. 435, 445

(1989) (noting that the government's injury includes "not merely the

amount of the fraud itself, but also ancillary costs, such as the costs of

detection and investigation, that routinely attend the Government's efforts

to root out deceptive practices directed at the public purse") (abrogated on

other grounds by *Hudson v. United States*, 522 U.S. 93 (1997)). "The treble

feature thus leaves the remaining double damages to provide elements of

make-whole recovery beyond mere recoupment of the fraud." *Cook

County*, 538 U.S. at 131. Moreover, even where a relator's share need not be

paid, "[t]he FCA has no separate provision for prejudgment interest, which

13

is usually thought essential to compensation," nor does it "expressly provide for the consequential damages that typically come with recovery for fraud." *Id.* For all these reasons, the Act's treble damages provision both helps ensure that the government is made whole post-fraud and deters fraud on the public fisc.

2. In *Bornstein*, the Supreme Court held that under the False Claims Act—which then provided for double damages—the government's "damages should be doubled *before* any compensatory payments are deducted." 423 U.S. at 314 (emphasis added). There, a subcontractor provided the government with substandard goods via a prime contractor, and the prime contractor had already paid the government a portion of the difference in the value of the goods as bargained-for and as actually provided. *Id.* at 313-14. The Court concluded that damages owed by the subcontractor must be doubled before subtracting out the prime contractor's remedial payments "because that method of computation most faithfully conforms to the language and purpose of the Act." *Id.* at 314.

14

The Court explained "this method of computation comports with the
congressional judgment that double damages are necessary to compensate
the Government completely for the costs, delays, and inconveniences
occasioned by fraudulent claims." *Bornstein*, 423 U.S. at 315.  And "the rule
that damages should be doubled prior to any deductions fixes the liability
of the defrauder without reference to the adventitious actions of other
persons." *Id.*  The Court reasoned that permitting compensatory payments
by a third party to reduce damages pre-multiplying "would mean that two
subcontractors who committed similar acts and caused similar damage
could be subjected to widely disparate penalties depending upon whether
and to what extent" the third party paid the government.  *Id.* at 315-16.  A
third party's "fortuitous acts should not determine the liability of the
subcontractor under the double-damages provision." *Id.* at 316.  The Court
further explained that this alternate method of calculation "would enable
the subcontractor to avoid the Act's double-damages provision by
tendering the amount of the undoubled damages at any time prior to
judgment," a "possibility [that] would make the double-damages provision

15

meaningless." *Id.* "Doubling the Government's actual damages before any deduction is made for payments previously received from any source in mitigation of those damages forecloses such a result." *Id.*

**B.    The District Court Misapplied *Bornstein* And Contravened The FCA's Purposes.**

The district court fundamentally misapplied *Bornstein* in this case. The court acknowledged that the jury concluded MWI's fraud caused the United States to suffer $7.5 million in "actual damages," and that under the FCA's treble damages provision, MWI was therefore liable for $22.5 million. Op. 8 [JA__]. The court nonetheless reduced MWI's damages liability to zero, reasoning that all $108 million that Nigeria ultimately repaid on the loans MWI fraudulently induced Exim to make was a "compensatory payment" under *Bornstein* that should offset—and therefore eliminate—MWI's liability. Op. 20-27 [JA__]. That is incorrect.

The district court reasoned that all $108 million of Nigeria's repayment was a compensatory payment for MWI's fraud because "the entire amount paid by Nigeria is unquestionably related to the underlying false claims." Op. 24-25 [JA__]. This reasoning fails to recognize that some

16

payments to the government may be in some sense a consequence of—but not compensation for—fraud.  As the term suggests, "compensatory payments" are those that compensate the government for the fraudulent conduct that gave rise to the treble damages award.  The prime contractor's compensatory payments in *Bornstein* were made specifically to reimburse the government for its damages due to the fraud.  *See Bornstein*, 423 U.S. at 314 (noting that the government "received $40.72 per tube as damages" from the prime contractor).

Here, however, Nigeria had an obligation separate and apart from MWI's fraud to repay the funds it borrowed from Exim and satisfy its interest and late fee payment obligations pursuant to its contract with Exim.[4]  Whether or not MWI had behaved fraudulently in inducing the United States to enter into its loan contract with Nigeria, and whether or not this case had ever been filed, Nigeria's loan repayment obligations existed.   Nigeria ultimately repaid $108 million not to compensate the United States for its losses due to fraud, but rather to satisfy those

---

[4]  *See, e.g.,* Plaintiff's Trial Exhibit 273, at 3.

17

obligations; it repaid only what it owed the government under the terms of

its contract.  Thus, all of Nigeria's loan payments were not "compensatory"

within the meaning of *Bornstein*.

At most, Nigeria's repayment of its loan obligations should have

offset the government's original losses due to MWI's fraud, which the jury

determined were $7.5 million.  Although the jury did not specify how it

arrived at this figure, under the view most favorable to MWI, this is the

amount that the jury determined Exim's loan to Nigeria was inflated

because of MWI's improper payment of irregular commissions to Mr.

Indimi.  *See* Op. 5 [JA__] (quoting Jury Instructions 41:19-24 [JA__])

(instructing the jury "that damages were 'the amount of money the

government paid because of the false claims over and above what it would

have paid had MWI not made the false claims'").  Under this view of the

jury's damages award, Nigeria's eventual full repayment of the loan could

be considered to compensate the United States for its original $7.5 million outlay due to fraud.[5]

Under no view of the jury's verdict, however, should MWI be able to avoid *all* damages liability because Nigeria satisfied its separate loan obligations.[6]  The district court's error in concluding that Nigeria's loan repayments entirely discharged MWI's liability for treble damages is clear from a recounting of what the government was owed and what it received. The government was owed:  (1) $66.8 million for the arguably legitimate portion of the loan, plus interest and fees; (2) the $7.5 million portion of the

---

[5] The government contested any offset in the proceedings below only on the grounds that MWI had lobbied Nigeria to repay this particular loan at the expense of $618.6 million in other loans on which Nigeria has defaulted.  *See* Docket No. 458 at 3-5.  The district court concluded that the United States had failed to carry its evidentiary burden on this point, *see* Op. 12-16 [JA__], and the United States does not challenge that finding in this appeal.

[6] If Exim had made two different loans to Nigeria, one of which was induced by fraud and the other legitimately obtained, Nigeria's repayment of the untainted loan could not plausibly be regarded as compensation for the government's losses from the fraud.  There is no reason for a different analysis here.

loan the jury appears to have concluded was fraudulently obtained; and (3) $15 million in the remaining portion of the treble damages award. The government received: (1) $66.8 million for the arguably legitimate portion of the loan, plus interest and fees; (2) the $7.5 million portion of the loan the jury appears to have concluded was fraudulently obtained; and (3) $0 for the remaining portion of the treble damages award. Moreover, in failing to appreciate that Nigeria's loan repayments are not in their entirety "compensatory payments," the district court's reasoning turns *Bornstein* on its head and undermines the basic purposes of the FCA's damages provision.

Most fundamentally, the district court erred in suggesting that the FCA's language required it to offset MWI's damages liability by the entirety of Nigeria's loan repayments. *See* Op. 25 [JA__]. The statutory language does not address how to calculate damages or account for compensatory payments, as the Supreme Court has recognized. *See Bornstein*, 423 U.S. at 314 n.10 (noting that the statute stated only that "damages" should be multiplied, without specifying whether the statute

20

meant "net" or "uncompensated damages").  In light of this silence, the

Supreme Court has indicated that courts should adopt the interpretation of

the Act that "most faithfully conforms to [its] language *and purpose*."  *Id.* at

314 (emphasis added).  The district court's dismissal of the government's

"public policy argument" regarding the Act's purposes was thus mistaken.

*See* Op. 25 [JA__].

The manifold purposes of the Act would be seriously undermined if

repayment of a freestanding financial obligation satisfied a defendant's

obligation to pay the government multiplied damages.  As the Supreme

Court has made clear, the Act evinces the "congressional judgment" that

multiplied damages "are necessary to compensate the Government

completely for the costs, delays, and inconveniences occasioned by

fraudulent claims."  *Bornstein*, 423 U.S. at 314.  The government should

have been repaid by Nigeria regardless of any fraud by MWI, and the

district court's conclusion leaves the inevitable costs associated with fraud

and its detection in federal programs entirely uncompensated.  *See, e.g.,*

*Halper*, 490 U.S. at 445 (noting that the government's injury includes "not

21

merely the amount of the fraud itself, but also ancillary costs, such as the

costs of detection and investigation, that routinely attend the Government's

efforts to root out deceptive practices directed at the public purse"); s*ee also*

*United States v. Eghbal*, 475 F. Supp. 2d 1008, 1018 n.13 (C.D. Cal. 2007)

(rejecting "Defendants' argument that their wrongdoing was essentially

harmless because the Government ultimately recovered a portion of the

money it paid as a result of the 27 defaulted loans"), *aff'd*, 548 F.3d 1281

(9th Cir. 2008); *United States v. Mackby*, 339 F.3d 1013, 1019 (9th Cir. 2003)

("Congress specifically rejected a 'no harm, no foul' argument[.]").

Moreover, given Congress's subsequent amendment of the FCA to provide

treble rather than double damages, and the attendant increase in the

deterrent aspects of the Act's remedies, the district court's elimination of

the government's ability to recover multiplied damages defeats these other

purposes of the Act's revised damages provisions.

       In addition to subverting the fundamental purposes of the treble

damages provisions, the district court's reasoning runs afoul of the

Supreme Court's instructions regarding the effect of compensation from a

third party.  Even before Congress increased the damages multiplier and added to the Act's deterrent aspects, the Supreme Court had recognized that the liability of the defrauder should be fixed "without reference to the adventitious actions of other persons."  *Bornstein*, 423 U.S. at 315.  In *Bornstein*, the Court declined to offset damages before multiplying them because that "would mean that two subcontractors who committed similar acts and caused similar damage could be subjected to widely disparate penalties depending upon whether and to what extent" the third party paid the government, emphasizing that a third party's "fortuitous acts should not determine the liability" of the liable party.  *Id.* at 315-16.  But the district court's analysis here does just that, essentially excusing a party from all damages stemming from its fraud in inducing the government to make payments to a third party in the loan context, for all fraud up to one third of a repaid loan.[7]  The unfair windfall to MWI, and accompanying

---

[7] The district court's approach would also significantly decrease relators' economic incentives to bring *qui tam* suits regarding fraud in federal loan programs, thus undermining not only the United States' ability to recover consistent with the treble damages provisions, but also

*Continued on next page.*

23

subversion of the Act's deterrent purposes, would be all the greater here because unlike the subcontractor in *Bornstein*, MWI is not liable to Nigeria for the amount that Nigeria repaid to Exim.  *Cf. Bornstein*, 423 U.S. at 314 n.9 (noting that "[subcontractor] United is liable to [prime contractor] Model for Model's payment to the United States").

The district court's reasoning further contravenes the Supreme Court's conclusion in *Bornstein* that FCA should not be interpreted to permit strategic compensatory behavior that would undermine the Act's damages provision.  The Supreme Court rejected a reading of the Act that "would enable the subcontractor to avoid the Act's double-damages provision by tendering the amount of the undoubled damages at any time

Congress's intention to encourage relators by granting them a portion of such trebled damages.  *See* Senate Report 2 (noting the need for "a coordinated effort of both the Government and the citizenry" to combat fraud and stating that the amendments to the Act "increase[] incentives, financial and otherwise, for private individuals to bring suits on behalf of the Government"); *see also Burlington Indus., Inc. v. Milliken & Co.*, 690 F.2d 380, 393 (4th Cir. 1982) (that "one purpose of the trebling provision [in an antitrust statute] is to encourage private plaintiffs to bring suit," and that "[a]ny ultimate recovery totaling less than three times proven damages would weaken the statutory incentive through judicial construction") (internal quotation marks and citation omitted).

prior to judgment," a "possibility [that] would make the double-damages

provision meaningless." *Bornstein*, 423 U.S. at 316.  The district court's

conclusion that Nigeria's fulfillment of its independent financial obligation

to the government eliminated MWI's damages liability would enable just

this sort of gamesmanship.  A defendant in danger of incurring FCA

liability in the loan context could simply repay a loan, or induce

repayment, to avoid the Act's damages provision.  As long as the loan and

any attendant interest or fee payments did not exceed three times the

damages caused by the fraud, repayment at any time before the

government won a judgment would—under the district court's

reasoning—entirely eliminate a defendant's damages liability.  Indeed,

under the district court's approach, a fraudulent borrower who yokes

improper loans to valid ones could arrange to pay nothing in FCA

damages.  The government's interest in being made whole for fraud in its

loan programs, and the Act's purpose in deterring fraud, should not be

subject to evasion by such tactics.

25

## C.     Precedent Does Not Support The District Court's Offset Calculation.

The district court also erred in concluding that this Court's precedent supported its decision to offset MWI's damages liability by the entirety of Nigeria's loan repayment.  This Court has concluded that in some instances, courts should calculate damages using a "benefit-of-the-bargain measure" by gauging "the difference between the value of the goods or services actually provided by the contractor and the value the goods or services would have had to the government had they been delivered as promised."  *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1278 (D.C. Cir. 2010); s*ee United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 839-40 (D.C. Cir. 2012).   The district court concluded that Nigeria's repayment made the United States "completely whole," invoking this Court's decision in *Davis* for the proposition that "where fraud on the Government has occurred but, because the Government has gotten what it paid for, the Government's recovery is limited to civil penalties."  Op. 26 [JA__].

26

These cases, however, do not suggest that the district court correctly viewed all of Nigeria's loan repayments as "compensatory" within the meaning of *Bornstein*. The district court's analysis confuses the question of whether the United States suffered any damages at all with the question of how to calculate and offset trebled damages. The jury here found that the government *did* suffer $7.5 million in damages. *See* Docket No. 453 [JA__]. Cases governing how to calculate original damages have no bearing on how to determine what payments to the government are "compensatory" within the meaning of *Bornstein*.

Nor is there anything extraordinary in recognizing that only a portion of Nigeria's loan repayments can plausibly be considered compensatory under *Bornstein*. *Cf.* Op. 21 [JA__]. As explained above, deeming Nigeria's satisfaction of its freestanding financial obligations to the United States "compensation" for MWI's fraud has no basis in the statute or *Bornstein*. Even where the defendant itself has made a payment in some way connected to the conduct underlying the FCA verdict, courts have not offset damage awards by portions of such payments that do not

27

actually help redress the government's injury.  Where a defendant had

paid $1,346,220 in criminal restitution for making false statements

regarding 62 federally insured properties, *see United States v. Eghbal*, Docket

No. 35, Case No. 2:03-cr-465 (C.D. Cal.), a court nonetheless recognized

only $499,387 of that restitution as compensatory in a civil FCA case

concerning 27 of those properties, *see Eghbal*, 475 F. Supp. 2d at 1011, *aff'd*,

548 F.3d 1281 (9th Cir. 2008).    And in *United States ex rel. Schaefer v. Conti*

*Medical Concepts, Inc.*, No. 3:04-cv-400, 2010 WL 1485660 (W.D. Ky. Apr. 12,

2010), a district court rejected a defendant's argument that his prior $80,000

criminal restitution payment should offset all $1,212.72 in trebled civil

damages, which were awarded based on the same conduct.  *See id.* at *3-4

(reasoning that "subtractions should only be made for 'compensatory'

payments," limited in that case to the actual damages amount of $404.24).[8]

---

[8] The district court here erroneously concluded *Schaefer* involved
"excess amounts paid in criminal restitution . . . paid for unrelated
conduct."  Op. 24 [JA__].  But *Schaefer* makes clear that both the $80,000
criminal restitution payment and civil damages award were related solely
to the same single instance of falsely altering a prescription in violation of
the FCA.  *See Schaefer*, 2010 WL 1485660, at *1, *3; *United States ex rel.*

*Continued on next page.*

28

*Cf. Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 436

(3d Cir. 1993) (permitting, in the antitrust context, offset of trebled damages

award for plaintiffs' recovery under previous settlements only for portions

of the settlement that "represent damages arising under the same theory of

liability as those forming the basis for the jury award," such that "a settling

plaintiff is entitled to only one full recovery while at the same time . . . the

plaintiff [is protected] from the application of amounts received in

settlement of unrelated claims").

---

*Schaefer v. Conti Medical Concepts, Inc.*, No. 3:04-cv-400, 2009 WL 5104149, at *6 (W.D. Ky. Dec. 17, 2009).

## CONCLUSION

The judgment of the district court should be reversed insofar as it

concluded that MWI was not liable for damages under the False Claims Act

because of Nigeria's repayment.  This Court should remand with

instructions to enter a damages award of $15 million against defendants.


Respectfully submitted,

JOYCE R. BRANDA
    *Acting Assistant Attorney General*

RONALD C. MACHEN JR.
    *United States Attorney*

MICHAEL S. RAAB

 **/s/ Melissa N. Patterson**
MELISSA N. PATTERSON
    *(202) 514-1201*
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7230*
    *U.S. Department of Justice*
    *950 Pennsylvania Ave., N.W.*
    *Washington, D.C.  20530*


JANUARY 2015

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

I hereby certify that this brief complies with the requirements of

Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been

prepared in 14-point Palatino Linotype, a proportionally spaced font.

I further certify that this brief complies with the type-volume

limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,472 words,

excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii),

according to the count of Microsoft Word.



                                         **/s/ Melissa N. Patterson**

                                        MELISSA N. PATTERSON

## CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2015, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  I further certify that I will cause 8 paper copies of this brief to be filed with the Court within two business days.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system, except for the following, who will be served via U.S. Mail

Jason Cyrus Lynch
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595

 **/s/ Melissa N. Patterson**
MELISSA N. PATTERSON

**ADDENDUM**

# Addendum Contents

## Addendum A

31 U.S.C. § 3729(a)(1) (1986) .............................................................................A1

## Addendum B

*United States ex rel. Schaefer v. Conti Medical Concepts, Inc.*,
    No. 3:04-cv-400, 2009 WL 5104149 (W.D. Ky. Dec. 17, 2009) ..............A3

*United States ex rel. Schaefer v. Conti Medical Concepts, Inc.*,
    No. 3:04-cv-400, 2010 WL 1485660 (W.D. Ky. Apr. 12, 2010) ...........A10

# Addendum A

**31 U.S.C. § 3729(a) (1986)**

(a) Liability for certain acts.--Any person who--

    (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

    (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

    (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

    (4) has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

    (5) authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

    (6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge the property; or

-A1-

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person * * *.

# Addendum B

2009 WL 5104149
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
at Louisville.

UNITED STATES of America, ex.
rel. Bonnie SCHAEFER, Plaintiffs
v.
CONTI MEDICAL CONCEPTS, INC., Anthony
Conti, and Victoria Conti, Defendants.

Civil Action No. 3:04–CV–
400–H.   |   Dec. 17, 2009.

**Attorneys and Law Firms**

C. Dean Furman, Jr., Furman Nilsen & Lomond, PLLC,
Louisville, KY, for Bonnie Schaefer.

Benjamin Seth Schecter, L. Jay Gilbert, U.S. Attorney Office,
Louisville, KY, for United States of America.

Steven R. Romines, Romines Weis & Young, PSC,
Louisville, KY, for Defendants.

**MEMORANDUM OPINION**

JOHN G. HEYBURN II, District Judge.

**\*1** In this *que tam* action originally brought by Bonnie
Schaefer, the United States seeks recovery from Defendants
under the False Claims Act ("the FCA") for their improper
billing of medical back braces to Medicare and Medicaid. In
essence, the government claims that Defendants over-billed
for back braces they provided to patients from 1999–2003 by
utilizing an improper billing code and that Defendants acted
with reckless disregard of the truth or falsity of the claims
submitted. The case is set for trial beginning January 11,
2010, and the United States has moved for partial summary
judgment and in limine to exclude certain evidence. The
Court will address each in turn.

**I.**

Defendant Conti Medical Concepts, Inc. ("CMC"), was a
Kentucky Corporation in the business of supplying durable
medical equipment, such as back braces. [1] Anthony Conti

was the president of CMC and is married to Victoria Conti.
Mrs. Conti worked for CMC on a regular basis performing
a variety of job functions. She managed the books of
the company and, at times, submitted claims to insurance
companies including Medicare and Medicaid. In 2006, Mrs.
Conti signed CMC's annual report as the company's vice-
president [2] and in 2004 she signed as CMC's president on
Mr. Conti's Certificate of Incumbency and as a board member
on a Certificate of Action of the Board of Directors of Conti
Medical Concepts, Inc. All of those signatures post-date the
billing period in question and Mrs. Conti contends that she
was not an officer or director of CMC at any relevant time.

[1]   The company is no longer in business, largely as a
      result of a government raid and subsequent criminal
      proceedings involving the same facts as this case.

[2]   However, the report lists Anthony Conti as the sole
      officer of the company.

The essential issue in this case is the method of billing
Medicare and Medicaid for medical equipment that CMC
supplied to patients. Like most medical providers, CMC
submits its bills on a standard form called a "HCFA 1500."
These forms have spaces for codes that identify the products
provided and the insurance companies, including Medicare
and Medicaid, have set amounts that they pay for different
codes. Thus, the code represents the product received and
dictates the payment to the provider.

The relevant medical equipment in this case is a back brace
called "System–Loc." The brace consists of a front and back
piece that join around the patient's body to create a v-shaped
brace. CMC provided at least 734 System–Loc braces to
patients on government insurance programs from 1999 to
2003. For each brace, CMC submitted a HCFA 1500 with
the billing code L0565. Medicare and Medicaid reimburse
providers $874.04 per brace under this code. However,
the United States contends that the proper coding of the
System–Loc brace from 1999–2003 was L0515 with the
miscellaneous code L1499. [3] Bills submitted with these codes
are reimbursed at only $509.22 per total brace.

[3]   In essence, the L0515 code is used for the back portion
      of the brace and the L1499 miscellaneous code is
      used for the front portion of the brace. The two codes
      combined result in a reimbursement for the full System–
      Loc product.

The evidence as to the proper coding points in several
directions. Defendants contend that there was significant

U.S. ex rel. Schaefer v. Conti Medical Concepts, Inc., Not Reported in F.Supp.2d (2009)

2009 WL 5104149

USCA Case #14-5210     Document #1532096     Filed: 01/14/2015     Page 49 of 57

confusion among medical providers about the proper coding of the System–Loc brace from 1999–2003. Defendants cite to trial testimony from a criminal matter involving these same facts stating that Medicare and Medicaid did not officially assign a code to the System–Loc brace until July 3, 2003. Moreover, Defendants assert that a representative of Medicare and Medicaid reviewed Defendants' billing policies and informed them everything was being done properly. However, a patient status form approved by one of Defendants' employees indicates that in a March 16, 2000, phone call to "HCPCS" [4] Defendants were informed that the proper codes for the "V–Loc" brace [5] were L0515 and L1499.

[4]   HCPCS stands for Healthcare Common Procedure Coding System, which is the general label for the coding numbers used in healthcare billing. It is unclear whether Defendants called the national group that assigns HCPCS codes or some other entity.

[5]   "V–Loc" was the name of a similar brace manufactured prior to the System–Loc. At the hearing, the parties informed the Court that the System–Loc brace serves the same function as the V–Loc brace but has at least one additional feature. The government contends that the CMC employee was actually calling about a System–Loc brace, not a V–Loc brace.

 **\*2** On the other hand, the government argues that at all relevant times the L0515–L1499 combination was the only proper coding. As evidence, the government cites a 1999 letter to the System–Loc manufacturer from the national group that assigns codes stating that the L0515–L1499 combination is the proper method for billing the System–Loc brace despite the manufacturer's request that the coding be changed to L0565. The manufacturer of the System–Loc brace would inform medical providers, if they asked, that the L0515–L1499 codes were the proper method for billing its product. However, there is no physical evidence indicating that the manufacturer ever sent notice of the proper coding methods to CMC or that CMC ever inquired with the manufacturer regarding the proper codes. Another letter was sent by the manufacturer to the group responsible for coding on behalf of Medicare in 2003 to request a change to the L0565 code, but that request was also denied and Medicare restated its position that L0515 with the L1499 miscellaneous code was the proper method of billing.

In addition to submitting bills with improper coding, the government contends that CMC altered medical records to induce higher payments from Medicare and Medicaid.

According to the United States, employees of CMC, at Mr. Conti's direction, altered prescriptions written for the V–Loc brace to call for a more expensive brace called a Pro–Fitt, which was properly billable under the L0565 code. After altering the prescription, the government contends that CMC provided the patient with a System–Loc brace and billed for a Pro–Fitt brace. Defendants directly dispute this contention. While Defendants agree that some prescriptions were changed from V–Loc to Pro–Fitt, Defendants contend that this was done because the V–Loc was no longer being manufactured and Defendants believed that the Pro–Fitt was the proper brace for Medicare and Medicaid patients. Defendants assert that all patients received the brace for which the insurance companies were billed and there is no significant evidence from the government to the contrary.

However, on July 18, 2007, Mr. Conti pled guilty to the following criminal count:

> On or about August 12, 2003, in the Western District of Kentucky, Jefferson County, Kentucky, the defendant, ANTHONY J. CONTI, knowingly and willfully made and caused to be made a false statement and representation of material fact for use in determining rights to a payment under a Federal health care program as that term is defined in Title 42, Units States Code, Section 1320a–7b(f). That is, an employee of Conti Medical Concepts, based on policy and procedure established by defendant, ANTHONY J. CONTI, altered a prescription for a patient, V.F., which prescription was submitted to Medicare in support of its request for payment relating to Medicare beneficiary, V.F.

(emphasis in original). The plea agreement leading to this plea was reached after the government presented its evidence at the criminal trial. In return for dropping all other charges, Mr. Conti pled guilty to a misdemeanor for one count of altering prescriptions and was forced to pay a $100 fine. Additionally, Mr. Conti surrendered any right to the contents of a Medicare escrow account, totaling approximately $79,279.35. [6] There was no evidence that this was the actual damage done as a result of the falsification of V.F.'s prescription and no findings by the court as to actual damages. CMC, as an entity, also

U.S. ex rel. Schaefer v. Conti Medical Concepts, Inc., Not Reported in F.Supp.2d (2009)
2009 WL 5104149

USCA Case #14-5210      Document #1532096      Filed: 01/14/2015      Page 50 of 57

pled guilty to a felony for the same acts related to a different patient. Because the company was no longer in existence and had no assets, restitution from CMC was not awarded. The government dropped all charges against Mrs. Conti.

6      Apparently this was the amount believed to be in the escrow account. In reality, the account contained slightly less and Mr. Conti personally paid the difference. The court labeled this amount as a restitution award.

## II.

**\*3** Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(c). "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* "The moving party has the 'initial responsibility of informing the district court of the basis for its motion, and identifying those portions' of the record showing an absence of a genuine issue of fact." *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845, 848 (6th Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Then "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Id.* (quoting Fed.R.Civ.P. 56(e)). Important to this case, "summary judgment is likely to be inappropriate in cases where the issues involve intent." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988) (quotation omitted). However, such a statement does not mean that summary judgment for the plaintiff is impermissible where the claim involves a scienter element. *See, e.g., United States v. Midwest Specialties, Inc.,* 142 F.3d 296 (6th Cir.1998) (affirming a grant of summary judgment to the government under the False Claims Act, the same statute in issue here).

## III.

The government brings this case under the False Claims Act ("FCA") based on two distinct factual allegations: (1) submission of improperly coded bills violated 31 U.S.C. § 3729(a)(1); and (2) altering prescriptions to receive reimbursement from government insurance programs violated 31 U.S.C. § 3729(a)(2). These two provisions provide independent bases for liability. 31 U.S.C. § 3729(a)(1) provides liability for any person who "knowingly

presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval." § 3729(a)(2) provides liability for any person who "knowingly makes, uses, or caused to be made or used, a false records or statement to get a false or fraudulent claim paid or approved by the government." The statute goes on to define its terms.

> For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information—(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b). Liability under the FCA requires a civil penalty for each violation plus three times the amount of actual damages. 31 U.S.C. § 3729(a).

## A.

The government argues that summary judgment is appropriate on its action for submission of false claims based on 31 U.S.C. § 3729(a)(1) because the material facts making up the elements of the action are undisputed. In essence, the government must prove two elements: (1) that Defendants submitted, or caused to be submitted, false or fraudulent claims to the government; and (2) that Defendants took these actions "knowingly." While the government has certainly presented strong evidence of its claim, the Court does not believe that summary judgment is appropriate.

## 1.

**\*4** There is very little factual dispute as to the first element. The national organization responsible for determining proper billing codes wrote a letter in 1999 to the manufacturer of the System–Loc back brace stating that the proper coding for the brace is the L0515–L1499 combination. That determination was affirmed by the group responsible for setting Medicare's billing codes in 2003. At all relevant times, the manufacturer appears to have believed that L0515 and

-A5-

L1499 represented the proper method of billing the System–Loc brace. Moreover, Defendants have offered almost no evidence that the L0565 code was proper or the L0515 and L1499 codes were improper. While Defendants contend that the written description for both codes seems to fit the System–Loc brace, there is no evidence to refute the government's assertion that the L0515–L1499 combination was the coding method required by Medicare and Medicaid. Finally, it is agreed that Defendants billed the System–Loc brace under the L0565 code as a part of the policy put in place by Mr. Conti. Thus, it is apparent that Defendants submitted false claims to the government.

### 2.

The second element requiring "knowing" actions is the central point of contention here. Under the FCA, the government must prove, at a minimum, that Defendants acted with reckless disregard of the truth or falsity of the claims they submitted. While this standard certainly does not require proof of a specific intent to defraud the government, it does require some affirmative showing by the government. Mere negligence is insufficient. *See Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1478 (9th Cir.1996) (cited with approval by *U.S. ex rel. Swafford v. Borgess Medical Center,* 24 Fed. Appx. 491 (6th Cir.2001)).

As evidence of Defendants' reckless disregard of the truth, the government places great reliance on the letter to the brace manufacturer that identified L0515 and L1499 as the proper method of billing the System–Loc brace. The government argues that if anyone contacted the manufacturer to find out the correct billing codes, the manufacturer would have told them to use L0515 and L1499. However, there is no evidence that Defendants ever contacted the manufacturer. While the government claims that the manufacturer routinely sent notice of the proper billing codes with the first shipment of the braces, it has offered no evidence to support that contention. If the manufacturer did send such statements, it is likely it would have records proving the statements were sent. None have been presented to this Court.

The government argues, however, that there need not be proof that Defendants were actually told of the proper billing method by the manufacturer. Rather, according to the government, Defendants failure to contact the manufacturer means that they failed to take reasonable steps to ensure the validity of their billing procedures and, as such, acted with

reckless disregard of the truth or falsity of their claims. For this proposition, the government relies on *United States v. Krizek,* 111 F.3d 934 (D.C.Cir.1997), and *United States v. Stevens,* 605 F.Supp.2d 863 (W.D.Ky.2008). While both of these cases do indicate that a failure to take reasonable steps to ensure validity constitutes reckless disregard, the factual application of that standard is dramatically different from the facts of this case.

**\*5** In *Krizek,* the defendants were a psychiatrist and his wife, who submitted the psychiatrist's bills to Medicare and Medicaid. Like this case, the defendants were sued under the FCA for submitting excessive bills to the government. However, in *Krizek* the Court held a three-week bench trial and determined that the defendants routinely billed for services in excess of 21 hours per day with occasional bills for services in excess of 24 hours per day. The Court found the validity of this billing to be improbable, if not impossible. Moreover, the defendants offered no evidence to establish that the services were legitimately provided. Thus, the Court found the defendants acted with reckless disregard because they "failed utterly" to ensure the validity of their billing. *Krizek,* 111 F.3d at 942. As the Court stated, "even the shoddiest record keeping would have revealed that false submissions were being made—those days on which the Krizek's billing approached twenty-four hours in a single day."*Id.*

This case is different than *Krizek.*While it may have been advisable for Defendants to contact the manufacturer to ensure proper billing, a failure to do so does not rise to the level of utter failure to do anything as found in *Krizek.*There, any person with common sense, could have realized that the records were false. That cannot be said here. The coding system for back braces is complicated. The government admits that the written description for code L0565 found in coding manuals appears to fit the System–Loc brace. Moreover, Defendants have presented some evidence that they took reasonable steps to ensure the validity of their bills. They claim that they used the same coding as Mr. Conti's previous employer, who had never had trouble billing for the brace under L0565. Perhaps most importantly, Defendants assert that a Medicare ombudsman who came to their office to review practices in 1997 told them, while noting one minor and unrelated error in billing, that their procedures were proper. These facts, combined with the apparent general confusion surrounding proper billing codes for back braces, certainly make the "knowing" element a jury question.

Likewise, *Stevens* does not ensure summary judgment for the government. There, Dr. Stevens utilized a new machine to provide services for which no billing code had been set by Medicare or Medicaid. When the insurance groups refused to pay Dr. Stevens, he turned his billing over to someone with absolutely no billing experience and the bills began to be paid. The new biller admitted that he intentionally submitted false claims under a code for services that simply were not provided. The question in *Stevens* was whether the doctor could be liable. Using the standard set forth in *Krizek,* Judge McKinley found that Dr. Stevens utterly failed to take any actions to ensure the validity of his claims. Dr. Stevens admitted that he never reviewed the bills submitted, that he gave no guidance on the proper codes to use, and that had he reviewed the billing he would have recognized that the new biller was billing for services not rendered. *Stevens,* 605 F.Supp.2d at 868–69. Again, this case presents different facts. Mr. Conti set the coding based on his belief that L0565 was a proper code for the System–Loc brace. He did not exercise the form of deliberate ignorance as Dr. Stevens.

 **\*6** A common theme in *Krizek* and *Stevens* is that both doctors billed for services that simply were not rendered and both doctors recognized that the billing was improper. Here, there is no dispute that back braces were provided to CMC's patients. The only dispute is what the proper billing code was for those braces. Reasonable jurors might reach different conclusions about whether Defendants failed to take reasonable steps to ensure the validity of their billing.

The government's better evidence on the knowing element is a patient status form filled out by one of CMC's employees in 2000. Notes indicate that the employee contacted Kentucky Medicaid to determine the proper codes for the "V–Loc" brace. The notes show that Medicaid informed the employee that the L0515–L1499 combination was appropriate. The government contends that this sheet proves Defendants acted with at least reckless disregard of the truth or falsity of their claims submitted under L0565. Again, the evidence strongly favors the government and may likely aid in getting a jury verdict. However, it does not warrant summary judgment. The document is for the "V–Loc" brace. While it may be that this was the term used for the System–Loc brace, the significance and meaning of the document is unclear. The Court will not grant summary judgment based on this one document of unknown significance.

## B.

With respect to its claim for falsification of records, the government relies exclusively on the guilty pleas of Mr. Conti and CMC entered in the criminal trial. 31 U.S.C. § 3731(d) provides,

> Notwithstanding any other provision of law, the Federal Rules of Criminal Procedure, or the Federal Rules of Evidence, a final judgment rendered in favor of the United States in any criminal proceeding charging fraud or false statements, whether upon a verdict after trial or upon a plea of guilty or nolo contendere, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subsection (a) or (b) of section 3730.

There is no dispute that this action is brought under subsections (a) and (b) of section 3730 and that Mr. Conti and CMC each pled guilty to altering one prescription for one patient. Thus, the plain language of the statute requires this Court estop defendants from denying the elements of one claim of falsifying a prescription under 31 U.S.C. § 3729(a) (2). The only issue that remains is the extent of such estoppel.

First, the government contends that the guilty plea should estop the defendants from denying the elements of every claim of altering a prescription. Neither the statute nor the facts here support this conclusion. The Court is acutely aware of the reality behind this guilty plea. The government presented its entire case to the jury before this plea was entered. Without the deal, Mr. Conti faced felony charges, potential prison time, and significant monetary damages for which he would personally be liable. Yet, with the deal, Mr. Conti pled guilty only to a misdemeanor, served no prison or probation time, and merely surrendered the funds in an escrow account, possession of which he did not have. To say that this was a "good deal" for Mr. Conti may be a dramatic understatement. It also speaks to the weaknesses of the government's case. Such a guilty plea, which Mr. Conti undoubtedly would have been foolish to reject, should not, in fairness, preclude Mr. Conti from defending the government's allegations. The Court can reconcile this

-A7-

fairness interpretation and the demands of the statute. The statute requires estoppel only for claims "which involve the same transaction as in the criminal proceeding."*Id.* For Mr. Conti, that transaction was the altering of one prescription for a patient named "V.F." The statute does not require estoppel of any other defenses. Thus, for purposes of the trial, Mr. Conti will be estopped from denying the elements of that single claim. The Court will determine the appropriate damages arising from this one claim and enter judgment in favor of the government at a later time.

**\*7** The government cites *United States v. Stokes,* 640 F.Supp.2d 927 (W.D.Mich.2009), for the proposition that Mr. Conti should be estopped from denying the elements of all claims related to altering prescriptions. In *Stokes,* the defendant was convicted of 17 counts of defrauding the government, but the subsequent civil trial sought recovery for 8,400 counts. The court determined that the defendant was estopped from denying liability on all counts based on the guilty plea. However, the court specifically noted that at the criminal trial, the jury was instructed to find the defendant guilty it must find that "he devised a scheme to defraud a health care benefit program."*Id.* at 930.Moreover,

> the evidence at trial was not limited to the 17 executions alleged in the Superseding Indictment. Instead it established that Stokes' regular practice for many years was to bill for [services not rendered].... Because the evidence established an ongoing fraudulent scheme during the years in question, there is no basis to conclude that estoppel arising under 31 U.S.C. § 3731(d) or common law issue preclusion is limited to the 17 executions of which Stokes was convicted.

*Id.* That type of evidence was not found in this criminal trial. Thus, this Court will not apply estoppel to all claims.

Second, the government argues that Mrs. Conti is liable under the guilty plea of CMC because she was an officer of CMC and involved in the altering of prescriptions. Another part of the plea agreement between the government, CMC and Mr. Conti was that all charges against Mrs. Conti would be dropped. Further, Mrs. Conti disputes that she was an officer of the company at the relevant times. The government has offered documents filed with the Kentucky Secretary of State

where Mrs. Conti signed as a "Vice–President," but those documents also indicate that Mr. Conti was the sole officer of CMC and are dated from 2004–2006. The government has offered no definitive evidence that Mrs. Conti was an officer or director of CMC during the time period when alteration of prescriptions allegedly occurred. Judgment against Mrs. Conti on these facts would be inappropriate.

## IV.

The government has also filed a motion in limine seeking to exclude certain evidence from trial. The Court will address each objection individually.

First, the government seeks to exclude all testimony that Medicare and Medicaid changed billing codes and reimbursement amounts for the System–Loc and Pro–Fitt braces effective April 1, 2004 as irrelevant. Essentially, on April 1, 2004, Medicare and Medicaid began reimbursing the System–Loc brace at approximately the same rate it was previously reimbursing braces billed under the L0565 code and reduced reimbursement for the Pro–Fitt brace to the level of the previous L0515–L1499 combination. Defendants argue that the reason for the change was confusion regarding the proper billing of the System–Loc brace. If Defendants are correct, the change and reasoning for it will certainly help establish Defendant's argument that their actions were not "knowing" under the statute. Therefore, the Court will deny this motion subject to the testimony at trial.

**\*8** Second, the government seeks to exclude any testimony that an ombudsman visited CMC in 1997 and informed them their billing procedures were proper. The government claims this testimony is irrelevant for three reasons: (1) Defendants cannot recall the ombudsman's last name; (2) Defendant's can't recall whether the specific codes for the System–Loc brace were discussed; and (3) the visit predates the 1999 letter from the coding organization to the brace manufacturer identifying L0515 and L1499 as the proper coding for the System–Loc brace. The government's objections go to the weight of the testimony, not its admissibility. If Defendants can convince the jury that an ombudsman informed them their billing methods were proper in 1997, it will likely go a long way in disproving the government's contention that Defendants acted with reckless disregard of the truth or falsity of the claims submitted. Thus, the motion will be denied subject to the actual testimony given.

-A8-

Third, the government seeks to exclude any testimony that charges against Mrs. Conti were dropped as a part of the plea deal as irrelevant. The Court agrees that such testimony would not be helpful to the jury and may unfairly prejudice the jury in favor of Mrs. Conti.

Fourth, the government moves to exclude argument that Mr. Conti did not alter the prescription of a patient named "V.F." As discussed above, 31 U.S.C. § 3731(d) estops Mr. Conti from making such an argument. Therefore, the Court will sustain this motion.

Fifth, the government contends that the fact restitution was ordered in the criminal trial and the amount ordered and paid

is irrelevant to this case. The Court agrees and will sustain this motion.

Finally, the government seeks to exclude testimony that under the FCA any actual damages award will be trebled, civil penalties will be imposed and the restitution award will be used to offset damages. These issues will not be helpful to the jury and, therefore, the motion will be sustained.

The Court will issue an Order consistent with this Memorandum Opinion.

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

U.S. ex rel. Schaefer v. Conti Medical Concepts, Inc., Not Reported in F.Supp.2d (2010)
2010 WL 1485660, Med & Med GD (CCH) P 303,349

USCA Case #14-5210      Document #1532096      Filed: 01/14/2015      Page 55 of 57

2010 WL 1485660
United States District Court, W.D. Kentucky,
at Louisville.

UNITED STATES of America, ex
rel. Bonnie SCHAEFER, Plaintiffs

v.

CONTI MEDICAL CONCEPTS, INC., Anthony
Conti and Victoria Conti, Defendants.

Civil Action No. 3:04–CV–
400–H.    |    April 12, 2010.

**Attorneys and Law Firms**

C. Dean Furman, Jr., Furman Nilsen & Lomond, PLLC,
Benjamin Seth Schecter, L. Jay Gilbert, U.S. Attorney
Office, Steven R. Romines, Romines Weis & Young, PSC,
Louisville, KY, for Defendants.

**MEMORANDUM OPINION**

JOHN G. HEYBURN II, District Judge.

*1  This case involving alleged violations of the False Claims
Act ("the FCA") was tried before a jury January 11–15,
2010. The Jury returned a verdict in favor of Defendants
on every count. Plaintiff (the "Government") now moves
for judgment as a matter law under Federal Rule of Civil
Procedure 59 on the unjust enrichment and alteration of
documents claims. In the alternative, it moves for a new
trial. Finally, the Government asks for a judgment against
Defendant Anthony Conti based on the Court's determination
in a December 17, 2009 Memorandum Opinion (DN # 97)
that Mr. Conti was estopped from denying one count of
altering a prescription. For the following reasons, the Court
will deny the Government's motion for judgment as a matter
of law or, in the alternative, a new trial, but the Court will
enter a judgment against Mr. Conti on one count of altering
a prescription.

**I.**

The Government premises their argument for judgment as
a matter of law or a new trial solely on the testimony of
James Patton, which the Government believes was false.
Mr. Patton, a durable medical goods provider, was called by

Defendants to testify regarding communications he received
from American Professional Bracing regarding the proper
method of billing SystemLoc back braces. Indeed, his
*direct* examination was limited to precisely that issue. The
Government does not contest any of that testimony. Rather, it
contends that Mr. Patton's testimony on *re-cross* examination,
which its *conducted,* was materially false and misled the
jury. On re-cross examination, the Government repeatedly
questioned Mr. Patton about whether and why he did not seek
out a Medicare letter regarding the proper billing procedures
for the System–Loc brace. Mr. Patton testified that he never
asked for such a letter. After several questions about whether
he was bound to Medicare's coding decisions, Mr. Patton
finally said that he did not request the letter because Medicare
was paying his claims under the L0565 code and they would
have told him if that code was incorrect. In fact, according
to Mr. Patton, he appealed approximately 200 cases where
the Government "down-coded" his bills for the System–Loc
brace and was successful. It is this testimony, elicited by the
Government, to which it now objects.

The Government contends that the testimony related to the
successful appeals was false and that without Mr. Patton's
testimony, no evidence supported the jury's verdict with
relation to the unjust enrichment claim and the alteration of
documents claims. Following the jury verdict, a Government
investigator went to Mr. Patton's home town to review
documents related to his Medicare appeals. The investigator
determined that Mr. Patton did, indeed, appeal several cases
where the Government "down-coded" his bills for System–
Loc braces. According to the investigator, Mr. Patton won
those appeals because he submitted evidence that a Pro–Fitt
back brace, which everyone agrees properly bills at code
L0565, was provided to the patients instead of a System-loc
brace. While this may indicate that Mr. Patton's testimony
was *misleading,* it does not show that it was materially false.
In fact, Mr. Patton did pretty much what he said he did. He
billed for a System–Loc brace, was down-coded, appealed
that decision, and was successful. Certainly, Mr. Patton left
out some crucial information about those appeals and the
basis for his success and that information may have made
for a strong impeachment had the Government known about
it at trial. However, that does not entitle the Government to
judgment as a matter of law or a new trial.

*2  The Court bases its decision to deny the Government's
motion on several factors. First, this is not a typical case
where a party moves for judgment or a new trial because its
opponent purposefully solicited false testimony. Rather, the

-A10-

Government itself elicited the allegedly false testimony. On re-cross examination, it counsel asked who was responsible for determining the proper codes for Medicare and asked whether Mr. Patton was bound by Medicare's decisions. It wasn't until counsel repeated this line of questioning that Mr. Patton testified that Medicare had paid him under L0565 following multiple appeals. While not directly on point with the Government's questions, Mr. Patton's testimony was not entirely non-responsive. By choosing to probe Mr. Patton's knowledge of Medicare billing and the proper codes for System–Loc braces, the Government seemed to invite Mr. Patton's testimony. To hold Defendants accountable for such actions at this stage would be unjust.

Second, the Government had possession of the information needed to determine the "falsity" of Mr. Patton's testimony long before this trial began. [1] Defendants identified Mr. Patton as a potential witness regarding the proper billing of the System–Loc back brace in their discovery materials. He was later identified in Defendants' witness list prior to trial. The Government acknowledged at trial that it knew Mr. Patton was under investigation for altering records and that search warrants had been served on his business. The Government could have deposed Mr. Patton and it could have examined the investigative records related to him. To hold Defendants accountable in these circumstances would be quite unjust.

[1]   In fact, the Government used exclusively documents already in its control to uncover the alleged falsity of Mr. Patton's testimony.

Third, at the time the testimony was given, the Government knew that the SADMERC letter, which it considers dispositive of the issue of the proper code for the System–Loc brace, [2] identified L0515 with an L1499 modifier as the *only* proper method of billing the brace. With that letter in hand, the Government was certainly on notice that there was a possible error in Mr. Patton's testimony. [3] Yet, the Government took no immediate action to redress it through rebuttal testimony or through a brief recess to check the veracity of the testimony. Nor did the Government attempt to impeach Mr. Patton with the letter showing the impossibility of success in appealing through Medicare. [4]

[2]   Throughout the Government's brief it references a sentence from this Court's December 17, 2009 Memorandum Opinion noting that there appears no evidence indicating the bills were not false. According

to the Government, that is the "law of the case" and Defendants should not be allowed to contest it. However, that sentence was certainly not the Court's finding in that opinion. In fact, the Court's finding was squarely against the Government; the Court largely denied the Government's motion for summary judgment. Rather, the sentence was an observation of the evidence before the Court on the motion. The evidence presented at trial, especially through the effective cross examination of Government witnesses, clearly refuted the Court's observation in its Memorandum Opinion. As such, there is no "law of the case" to be followed here.

[3]   Indeed, the Government noted this at a bench conference with the Court.

[4]   The discussion in the preceding two paragraphs is especially probative of the issue of a new trial. To be entitled to a new trial, the moving party must show that it "was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial." *Gordon v. U.S.,* 178 F.2d 896, 900 (6th Cir.1949). Certainly, the Government cannot meet such a standard on the record before the Court.

Finally, the Court finds, as it did during trial, that there was sufficient evidence, even absent Mr. Patton's testimony regarding his appeals, to support a finding by the jury on all counts of the Complaint. The cross examination of the Government's witnesses clearly established a great deal of confusion and secrecy regarding the proper billing codes for the System–Loc brace. In fact, the Government concedes that it never released its SADMERC letter or anything else with the proper billing code for the System–Loc brace to the general public. Primarily, the Government argued that had the Conti's called and asked about the proper code, then Medicare would have told them. The jury easily could have found, based on such evidence, that it was not "unjust" for Defendants to keep the monies paid them by Medicare and Medicaid, a finding which would allow the jury's verdict in favor of Defendants on the unjust enrichment claim.

## II.

**\*3** Pursuant to the Court's December 17, 2009 Memorandum Opinion, the Government is entitled to a judgment against Mr. Conti on one count of altering a prescription to receive payment for a false or fraudulent claim from Medicare. The actual damages from that single count are $404.24. Pursuant to 31 U.S.C. § 3729(a), the Court must treble those damages, for a total of $1212.72, and award a

civil penalty of not less than $5,500.00 and not more than $11,000.00. Given the outcome at trial on all similar counts, the Court will award only the minimum civil penalty. Thus, the Court finds that the Government is entitled to $6,712.72 from Mr. Conti based on his plea agreement in the criminal matter related to this case.

Mr. Conti argues that he should not be held liable because he has already paid $79,279.35 as part of a criminal restitution order in the criminal proceedings related to the events of this case. However, the FCA specifically permits civil recovery in addition to any criminal proceedings related to the same events. See 31 U.S .C. § 3731(d) (allowing a criminal conviction to form the basis of liability under the FCA). What is less clear is how much the restitution order should offset the civil judgment. Mr. Conti appears to argue that the entire civil judgment should be offset. The Government contends that only the compensatory portion of the judgment should be offset. The Court finds that the Government's analysis and rationale is appropriate.

The Court notes that our case is an unusual one. In most cases, the restitution order is generally less than the Government's actual damages determined at a civil trial. Thus, there is no question that the restitution award offsets only the compensatory portion of the civil judgment. In our case, however, the Court narrowly crafted the civil judgment based on the realities of the criminal plea deal, resulting in a civil judgment that is significantly less than the restitution already paid. Although it is clear that Mr. Conti has previously paid nearly $80,000.00, that payment was merely compensatory. The civil judgment, on the other hand, reflects both compensatory damages and statutory fees. As a general rule, one judgment should only offset another judgment to the extent the judgments serve the same purpose. Thus, a restitution award for compensatory damages should offset only a civil judgment for compensatory damages. The Court finds that the statutory fees serve a different purpose than the compensatory damages paid under the restitution award. In *United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), the Supreme Court addressed how to calculate the then-applicable statutory doubling of damages where the defendant had previously paid restitution. The Court held that,

in computing the double damages authorized by the Act, the Government's actual damages are to be doubled before any subtractions are made for *compensatory* payments previously received by the Government from any source. This method of computation, which maximizes the deterrent impact of the double-damages provision and fixes the relative rights and liabilities of the respective parties with maximum precision, best comports in our view with the language and purpose of the Act.

**\*4** *Id.* at 316–17 (emphasis added). Thus, the Court recognized the very different nature of compensatory damages and statutorily imposed fees. Furthermore, the Court indicated that subtractions should only be made for "compensatory" payments.

The Court also notes that Mr. Conti could well have crafted his plea deal to allow for a total set off. When dealing with a criminal claim of defrauding the Government, a defendant should be aware of the possibility of civil liability. In fact, the Complaint in this case was served on Defendants before any deal was reached in the criminal proceedings. By failing to account for the effect of a criminal plea on the civil proceedings, Mr. Conti did not guard against a civil judgment of fines and fees that could not be set off by the restitution paid.

With these principles in mind, the Court will subtract from the total judgment the compensatory component, $404.24, as it was previously paid under the criminal restitution order. Doing so leaves the Government entitled to a judgment of $6,308.48.

This Court will issue a final order consistent with this Memorandum Opinion.

**Parallel Citations**

Med & Med GD (CCH) P 303,349

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.